**HOFFMAN–LA ROCHE, INC., et al., Plaintiffs,**

v.

**PROMEGA CORP, Defendant.**

No. C 93–1748 VRW.

United States District Court, N.D. California.

May 13, 2004.

James B. Lewis, Bingham McCutchen LLP, Barbara A. Caulfield, Denise M. Alter, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, Jennifer Gordon, Scott B. Familant, Orrick, Herrington & Sutcliffe LLP, New York City, John A. Ridley, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Todd Wagner, Pennie & Edmonds LLP, New York City, for plaintiffs.

Gary A. Ahrens, Michael, Best & Friedrich, Milwaukee, WI, Peter G. Carroll, Virginia S. Medlen, Haverstock, Medler & Carroll, San Francisco, CA, John C. Scheller, Michael, Best & Friedrich, Madison, WI, Leslie B. Posnock, Schwartz & Posnock, Sausalito, CA, Jennifer Gordon, Orrick, Herrington & Sutcliffe LLP, New York City, Russell L. Johnson, Skjerven Morrill LLP, San Jose, CA, for defendant.

ORDER

WALKER, District Judge.

At a case management conference on December 9, 2003, the court ordered the parties to provide memoranda discussing what remedies result from the court's December 7, 1999, order that was affirmed in part and reversed in part by the Federal Circuit. See Doc # 1294. Defendant requests various remedies and plaintiffs argue that the court's affirmed findings provide no basis for any remedies. According to the foregoing, the court GRANTS in part and DENIES in part, defendant's request for remedies.

I

The facts of this case have been explained in great detail in prior orders. Accordingly, the court provides only a short summary of the facts here.

Plaintiffs own two patents concerning the polymerase chain reaction ("PCR"): United States Patent No 4,683,195 ("'195 patent") and United States Patent No 4,683,202 ("'202 patent"). PCR is a method to produce a large amount of deoxyribonucleic acid ("DNA"). Large-scale DNA production is accomplished by repeatedly cycling through a number of steps, two of which the court notes. First, the two component strands of DNA must be separated from each other. The DNA strands usually are separated using heat. Second, an enzyme known as a DNA polymerase is used in creating copies of the separated DNA strands.

Plaintiffs also own a patent on a DNA polymerase derived from *Thermus aquaticus* ("Taq"), United States Patent No 4,889,818 ("'818 patent"). Plaintiffs' polymerase is thermostable, which means that it does not degrade at the high temperatures commonly used during PCR. If a non-thermostable polymerase is used in PCR, the use of heat to separate the two component DNA strands destroys the non-thermostable polymerase, requiring additional steps of cooling and polymerase supplementation. The use of a thermostable

polymerase in PCR is thus more efficient because the steps may be repeated a number of times without the need for cooling and polymerase supplementation during each cycle.

Defendant requests a number of remedies. First, defendant requests that the court again hold unenforceable the '818 patent for inequitable conduct. Second, defendant requests that the court hold unenforceable a number of patents that are not before the court in this litigation. Third, defendant requests that the court hold unenforceable, or, in the alternative, dismiss the causes of action based on, the '195 and '202 patents. Fourth, defendant requests that the court dismiss the breach of contract causes of action based on a license agreement concerning the '818 patent. Fifth, defendant requests that the court dismiss causes of action for interference with contractual relations and prospective economic advantage based on a distribution agreement between plaintiffs and Perkin–Elmer. Finally, defendant requests an award of attorney fees and expenses.

## II

■ To determine whether inequitable conduct has occurred, the court conducts a two-step analysis. In the first step, the court must determine whether there was a "misrepresentation or omission of a material fact, together with an intent to deceive the PTO." *Roche II*, 323 F.3d at 1359. Both materiality and intent must be demonstrated by clear and convincing evidence. *Id.* The first step is often referred to as the "threshold" step. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir. 1995). In the second step, the court must "determine whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct." *Roche II*, 323 F.3d at 1359.

After a bench trial, the court held the '818 patent unenforceable due to inequitable conduct. *Hoffmann–La Roche, Inc v. Promega Corp* ("*Roche I*"), 1999 WL 1797330 (N.D.Cal.1999). Three categories of misstatements supported the court's holding: "(1) representations regarding the difference in molecular weight between the claimed and prior art Taq enzymes; (2) representations that the inventors had performed Example VI, one of the procedures described in the specification, and that they had achieved the desired results; and (3) representations concerning the comparative fidelity and template dependence of the claimed enzyme and the prior art enzyme." See *Hoffmann–La Roche, Inc v. Promega Corp* ("*Roche II*"), 323 F.3d 1354, 1359–60 (Fed.Cir.2003). The court's holding was supported by eight misstatements, each of which the court concluded to be material and made with the intent to deceive. *Roche I*, 1999 WL 1797330 at Conclusions of Law ("CL") ¶ 35.

The court's holding in *Roche I* was affirmed in part and reversed in part by the Federal Circuit in *Roche II*. Of the three categories of misstatements, only the category relating to molecular weight was reversed. *Roche II*, 323 F.3d at 1360–63. Of the eight misstatements the court identified in *Roche I*, only two misstatements were reversed. See *Roche I*, 1999 WL 1797330 at CL ¶¶ 35(2), (3), (4), (5), (7) & (8) (affirmed misstatements); *id.* at CL ¶¶ 35(1), (6) (reversed misstatements).

■ The court's initial task on remand was defined clearly in *Roche II*, 323 F.3d at 1372. "We * * * remand the case to the district court to determine, in the exercise of its discretion, whether under all the circumstances, the incidents of inequitable conduct we have sustained are such as to justify the sanction of rendering the '818 patent unenforceable." *Id.* Accordingly,

the court's present analysis focuses on the second step of the inequitable conduct analysis.

Plaintiffs argue that the court should not hold unenforceable the '818 patent. Plaintiffs' primary argument is that the court's affirmed findings suggest only "meager" levels of materiality and intent. See Pl Br (Doc # 1300) at 9 ("This low level of materiality as to the remaining two grounds is accompanied by meager evidence that the applicants intended to deceive the PTO.").

This argument is unpersuasive because the threshold of materiality and intent under the first step of the inequitable conduct analysis is high. The standard of proof for step one is clear and convincing evidence. *Roche II*, 323 F.3d at 1359. Further, materiality and intent are exacting requirements. A misstatement or omission is material only if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue." *Id.* at 1367. As for intent, "[t]he involved conduct viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister*, 863 F.2d 867, 877 (Fed.Cir.1988). Accordingly, the court in *Roche I* did not, and could not have, concluded that the evidence regarding materiality and intent was only meager.

Plaintiffs also argue that the misstatements regarding purity and fidelity were "ancillary" to the prosecution of the patent. Pl Br (Doc # 1300) at 10 ("This Court and the Federal Circuit both recognized that purity was not an important topic during prosecution of the application resulting in the '818 patent."); *id.* at 20 ("[T]his Court and the panel majority both acknowledged that the fidelity issue was not a primary argument for patentability.").

The court disagrees with plaintiffs' characterization of the affirmed purity and fidelity findings. The court found that each of these misstatements "was material to the prosecution of the application that led to issuance of the '818 patent." *Roche I*, 1999 WL 1797330 at CL ¶ 35. Although the materiality standard is exacting, it is not a "but for" standard. See *Roche II*, 323 F.3d at 1367. Because the misrepresentations regarding purity and fidelity were material, plaintiff's contention that molecular weight was the primary argument for patentability is unavailing.

Plaintiffs reiterate claims of good faith that the court has previously rejected. Plaintiffs contend that the inventors subjectively believed that Example VI would be similar to, or better than, two experiments actually performed. Pl Br (Doc # 1300) at 17–18. The court previously rejected this contention and this rejection was affirmed by the *Roche II* panel. See *Roche I*, 1999 WL 1797330 at Findings of Fact ("FF") ¶¶ 71, 105 ("Although the inventors may have believed that Example VI was superior to either of the two purification methods on which it was based, the court finds that Example VI was written in the past tense in order to deceive the PTO into believing that it had actually been performed."); *Roche II*, 323 F.3d at 1365–66 (affirming the same).

Finally, plaintiffs contend that the evidence of intent was insufficient. Pls Br (Doc # 1300) at 15–18. The court previously rejected this argument and this rejection was affirmed by the *Roche II* panel. See, e g, *Roche II*, 323 F.3d at 1369–71 (relying on Kunkel's testimony to affirm the court's finding on intent).

In balancing the equities under the second step of the inequitable conduct analysis, the court considers the number and importance of the misstatements made by the patentees. The court's affirmed find-

ings are that the patentees committed inequitable conduct by:

- "making misleading statements regarding the relative fidelity of Taq as compared to the prior art enzymes;"
- "claiming that Taq purified by the method taught in Example VI had a specific activity of 250,000 units/mg;"
- "presenting Example VI as though it had been performed when, in fact, it had not been performed;"
- "making deceptive, scientifically unwarranted comparisons between the specific activity of the claimed enzyme and the specific activity reported by Chien et al. and Kaledin et al.;"
- "claiming that Taq purified according to the method taught in Example VI yielded a single 88 kd band on an SDS PAGE mini-gel and"
- "claiming that the Taq produced was free from nuclease contamination."

*Roche I*, 1999 WL 1797330 at CL 35; see also *Molins*, 48 F.3d at 1182 (affirming a holding of inequitable conduct even though only one of three misrepresentations relied on by the district court was affirmed). These misstatements together, and each of them individually, were material and made with the intent to deceive the PTO. *Id.*

The court concludes, in its discretion, that "the equities warrant a conclusion that the patentee has engaged in inequitable conduct." See *Roche II*, 323 F.3d at 1359. Because the court finds that inequitable conduct has occurred, the appropriate remedy is to hold unenforceable the patent obtained by inequitable conduct. *Kingsdown Medical Consultants*, 863 F.2d at 877. Accordingly, the court HOLDS unenforceable the '818 patent and DISMISSES plaintiffs' eighth cause of action, which claims direct, induced and contributory infringement of the '818 patent.

## III

■ Defendant seeks the court to hold unenforceable seven patents not at issue in this litigation (the "absent patents"). Defendant argues that the court's broad equitable powers combined with its personal jurisdiction over plaintiffs gives the court authority to hold the absent patents unenforceable. See Def Response (Doc # 1305) at 18:17–19 ("The fact that these other Roche patents are not before the Court does not prevent the Court from ordering Roche not to act in a certain way given the Court's personal jurisdiction over Roche."). Defendant, however, provides no legal support for this expansive view of the court's power. Accordingly, the court concludes that the court's equitable powers do not extend to patents that are not at issue in this litigation.

■ Defendant also requests leave to amend its counterclaim to include the absent patents. This is based on defendant's assertion, made in passing, that "Roche has threatened lawsuits against Promega based on other patents in this lineage." Def Br (Doc # 1301) at 34:26–28.

The court concludes that defendant's request for leave to amend should be denied for two reasons. First, courts may deny leave to amend under FRCP 15(a) in situations of "undue delay." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990). Because this case has already been in court for eleven years, a request to add new claims has been unduly delayed and would create undue delay in the future.

■ Second, a counterclaimant seeking declaratory relief must demonstrate "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory [counterclaimant] that it will face an infringement suit, and (2) present activity which could constitute infringement or

concrete steps taken with the intent to conduct such activity." *BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993). Defendant's suggestion in passing that Roche has threatened to sue on the absent patents does not justify granting leave to amend the counterclaim to add the absent patents.

Accordingly, the court DENIES defendant's request to hold the absent patents unenforceable.

## IV

### A

■ Defendant also moves the court to hold unenforceable or, in the alternative, to dismiss all claims based on the two remaining patents-in-suit, the '195 and the '202 patents. Defendant relies on two closely related doctrines, the infectious unenforceability and unclean hands doctrines. Remedies are available under the unclean hands doctrine if "some *unconscionable act* of one coming for relief has *immediate and necessary relation* to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (emphasis added); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 810–11 (Fed.Cir. 1990) (requiring the same in an infectious unenforceability case).

■ The doctrines of infectious unenforceability and unclean hands are closely related to the doctrine of inequitable conduct described above. Indeed, the doctrine of " 'inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO." *Consolidated Aluminum,* 910 F.2d at 812. In particular, the standards of "materiality" and "intent" under the inequitable conduct doctrine are merely refinements of the "unconscionable act" and "immediate and necessary relation" requirements under the unclean hands doctrine. The "uncon-

scionable act" is a material misstatement or omission with intent to deceive the PTO. Because the "equity" sought is the grant of a property right from the PTO, the "immediate and necessary relation" is evident in the materiality standard, which requires a "substantial likelihood that a reasonable examiner would consider [the misstatement or omission] important in deciding whether to allow the application to issue." See *Roche II,* 323 F.3d at 1367.

The doctrines of infectious unenforceability and unclean hands have been developed to aid in determining whether an unconscionable act that occurs during the prosecution of one patent has an immediate and necessary relation to the equity sought in the prosecution of another patent. In this case, the court concludes above that inequitable conduct occurred during the prosecution of the '818 patent on the basis of a number of misrepresentations. This conclusion demonstrates that a number of unconscionable acts occurred during the prosecution of the '818 patent. The question currently before the court, therefore, is whether these unconscionable acts bore an immediate and necessary relation to the equity sought during the prosecution of the '195 and '202 patents.

■ The court will distinguish between the doctrines of infectious unenforceability and unclean hands on the basis of remedy. Infectious unenforceability results in patents being held unenforceable, whereas unclean hands results in dismissal of some or all of the causes of action in a specific lawsuit. See *Aptix Corp v. Quickturn Design Systems, Inc,* 269 F.3d 1369, 1376 (Fed.Cir.2001) ("While inequitable conduct before the PTO renders the patent unenforceable by any party, the unclean hands doctrine bars only the offending party.").

The difference in remedies results from the immediate and necessary relation requirement under *Keystone Driller.* If an

unconscionable act is committed during the prosecution of a patent before the PTO, then the unconscionable act has an immediate and necessary relation to the equity sought before the PTO, namely the procurement of a patent. In other words, patents may be held unenforceable because "[i]nequitable conduct in the process of procuring a patent taints the property right itself." *Aptix*, 269 F.3d at 1376. Additionally, because such an unconscionable act has an immediate and necessary relationship to any subsequent attempt to enforce the patent in a court of equity, the court has the discretion under the unclean hands doctrine to dismiss the litigation brought to enforce such a patent. *Precision Instrument Manufacturing Co v Automotive Maintenance Machinery Co. ("Precision Instrument")*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

■ On the other hand, if the unconscionable act in question took place during litigation, the court has authority to use only the unclean hands doctrine to dismiss specific causes of action or the lawsuit in its entirety. "Litigation misconduct" may bar the litigant from proceeding with a pending lawsuit but does not "affect the viability of the property right itself." *Aptix*, 269 F.3d at 1375. In other words, litigation misconduct does not bear an immediate and necessary relation to the equity that was sought before the PTO, that is, the property right created by the patent.

Accordingly, the court uses the term infectious unenforceability if referring to holding unenforceable patents-in-suit based on unconscionable acts during the prosecution of another patent-in-suit. The court uses the term "unclean hands" if referring to dismissal of specific claims or the lawsuit in its entirety. The court adopts this terminology for purposes of this order but notes that courts sometimes use the terms "unclean hands" and "infectious unenforceability" interchangeably.

See, e.g., *Consolidated Aluminum*, 910 F.2d at 810–11.

## B

The court first considers defendant's argument that the court should hold unenforceable the '195 and '202 patents under the doctrine of infectious unenforceability. Plaintiffs argue that defendant has not demonstrated by clear and convincing evidence the necessary factual showing for a finding of unenforceability under the doctrine of infectious unenforceability. Pls Response (Doc # 1306) at 16. Defendant contends that the doctrine of infectious unenforceability does not require a factual showing; instead, infectious unenforceability is merely a question of equity. See Def Response (Doc # 1305) at 11 ("Ultimately, this Court is 'not bound by formula' (*Keystone*, 290 U.S. at 245–46, 54 S.Ct. 146) in fashioning a remedy that dismisses the Complaint and holds the patents-in-suit unenforceable.").

The two steps of the inequitable conduct analysis demonstrate well the difference in the parties' views. The inequitable conduct doctrine requires the court to find, as a factual matter by clear and convincing evidence, a "misrepresentation or omission of a material fact, together with an intent to deceive the PTO." *Roche II*, 323 F.3d at 1359. As a second step, the court must determine, in its equitable discretion, "whether the equities warrant a conclusion that the patentee has engaged in inequitable conduct." *Id.* at 1359. In essence, plaintiffs argue that the immediate and necessary relation inquiry under the infectious unenforceability doctrine is a question of fact similar to the first step of the inequitable conduct analysis. Defendant argues that the immediate and necessary relation inquiry is an equitable decision similar to the second step of the inequitable conduct inquiry.

The parties rely primarily on two cases, *Consolidated Aluminum* and *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321 (Fed. Cir.1998). Because of the importance of these cases to the court's analysis, the court considers the facts of these cases in detail.

1

a

In *Consolidated Aluminum*, the Federal Circuit considered, as a matter of first impression, whether other patents-in-suit could be held unenforceable based on inequitable conduct in the prosecution of a separate patent-in-suit.

Consolidated Aluminum owned six patents related to "the manufacture and use of ceramic foam filters for molten metal." *Id.* at 806. The ceramic filters were created by pouring an aqueous ceramic slurry into a foam block and then baking the slurry-foam composite until the foam "burn[ed] out." *Id.* at 811. During the prosecution of the first patent, United States Patent No 3,893,917 (" '917 patent"), which described a method for filtering molten metal through a ceramic filter, the patentee intentionally concealed the best mode slurry, the CS1–B slurry. Instead, the patentee provided the inoperative language "[a]dditives may be employed in the slurry such as binders." *Id.* at 811 (alteration in original). The court found that the intentional concealment of the best mode slurry sufficed to constitute inequitable conduct and held unenforceable the '917 patent.

In determining whether to hold unenforceable three related patents-in-suit, the *Consolidated Aluminum* court distinguished "mere relatedness of subject matter" from the " 'immediate and necessary relation' " requirement under *Keystone Driller*. *Id.* at 810–12 (quoting *Keystone Driller*, 290 U.S. at 245, 54 S.Ct. 146) (using also the terms "direct effect," "direct relation" and "permeated the prosecu-

tion" to describe the relationship between the '917 patent and the other patents-in-suit).

The *Consolidated Aluminum* court found unenforceable United States Patent No 3,962,081 (" '081 patent") due to the concealment of the best mode CS1–B slurry, which "enabled Consolidated to present the CS1–B slurry as part of the inventive disclosure in the '081 specification." *Id.* at 811. In particular, Consolidated Aluminum had argued to the PTO, in response to an office action rejection, that a specification discussing the best mode slurry was "clearly not inherently contemplated by the '917 patent." *Id.* at 811–12.

The *Consolidated Aluminum* court further held unenforceable two other patents-in-suit, the '212 and the '303 patents, because the '212 and '303 patents included a step using the best mode slurry and were continuations-in-part of the '081 patent. *Id.* at 812. The court notes that the *Consolidated Aluminum* court also found the two remaining patents-in-suit invalid.

b

In *Baxter*, the Federal Circuit considered whether to hold unenforceable related patents-in-suit based on unconscionable acts performed during the prosecution of a parent application. 149 F.3d 1321.

The plaintiff in *Baxter* owned three patents involved in administering intravenous ("IV") fluids and medications. *Id.* at 1324–26. To administer IV fluids, a catheter is inserted into the patient's vein and the catheter is connected to an IV administration set. To introduce liquids into the IV administration set, a needle is inserted through a rubber septum at an injection site. The prior art used sharp needles to introduce liquids. The use of sharp needles involved a trade-off: sharp needles minimized leakage problems by creating only small holes in the rubber septum but imposed the "risk of accidental pricks from

contaminated needles." *Id.* at 1325. Past attempts to use blunt injectors, also called blunt cannula, had failed because blunt cannula cause leakage problems by creating large holes in the rubber septum. The patentees invented a system which solved the problem of leakage and lowered the risk of accidental pricks. The patent claimed a method using a pre-manufactured slit that was closed by radial pressure on the septum to prevent leakage.

After the patentees in *Baxter* filed a patent application, the PTO issued a restriction requirement because "four separate inventions" were described in the application. *Id.* at 1326. The patentees filed a divisional application that separated the inventions into three patents that issued as United States Patent Nos 5,171,234 ("'234 patent"), 5,158,554 ("'554 patent") and 5,167,648 ("'648 patent"). The '554 patent was "directed to the blunt cannula," whereas the '234 and the '648 patents were directed to the method of injection.

The *Baxter* court held the '234 and '648 patents unenforceable due to inequitable conduct. The patentees intentionally concealed a device in the prior art, which had "all the features of the InterLink injection site, in the exact same form, except for the slit in the septum." *Id.* at 1328 (internal quotation omitted). The '234 and the '648 patents were held unenforceable because these patents related to the method of injection, which focused on the use of the slit.

The *Baxter* court concluded, however, that the '554 patent, which was directed toward blunt cannula, should not be held unenforceable because the undisclosed prior art was "not relevant to the claims directed to the blunt cannula in the '554 patent." *Id.* at 1331–32. The *Baxter* court held that claims separated through a divisional application should not be held unenforceable if the "claims have no relation to" the unconscionable act in question

or, in other words, if the unconscionable act "is in no way material" to the prosecution of the separated claims. *Id.*

### 2

Neither *Consolidated Aluminum* nor *Baxter* provides clear guidance on whether the immediate and necessary relation inquiry is factual or equitable and, if factual, what standard of proof applies. The use of a variety of terms in a fluid manner to describe the relation required to support a finding of infectious unenforceability suggests that the question is equitable. The terms used in *Consolidated Aluminum* and *Baxter* include "direct effect," "direct relation," "permeated the prosecution," "not relevant," "no relation," "no way material" and, of course, "immediate and necessary relation." *Consolidated Aluminum*, 910 F.2d at 810–12; *Baxter*, 149 F.3d at 1331–32.

Other aspects of the immediate and necessary relation inquiry suggest it to be a question of fact. As demonstrated above, the standards of materiality and intent in the inequitable conduct doctrine are merely refinements of the "unconscionable act" and "immediate and necessary relation" standards of the unclean hands doctrine. That materiality and intent are questions of fact suggests that the more general immediate and necessary relation inquiry is itself a question of fact. Moreover, the infectious unenforceability determination that was upheld in *Consolidated Aluminum* was supported by extensive factual findings. Indeed, the district court in *Consolidated Aluminum* made its decision only after a six-week trial conducted by a magistrate judge involving all the patents-in-suit. *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 716 F.Supp. 316 (N.D.Ill. 1989). Further, the district court concluded that the unconscionable acts that occurred during the prosecution of one patent were "material," as defined by the

inequitable conduct doctrine, to the prosecution of three other patents-in-suit. See *id.* at 330–31.

If the court assumes for the moment that the immediate and necessary relation inquiry is a question of fact, it is unclear whether the appropriate standard of proof for the immediate and necessary relation standard is clear and convincing evidence. The clear and convincing evidence standard of proof has been imposed in inequitable conduct cases to put an end to what the Federal Circuit has described as "an absolute plague of unjustified accusations of inequitable conduct." See *Molins,* 48 F.3d at 1182 (internal quotation omitted); *Roche II,* 323 F.3d at 1372 (Newman, J, dissenting). There would appear to be no reason to impose a more lenient standard for infectious unenforceability cases than for direct inequitable conduct cases.

In the end, the court need not decide this issue, because the court concludes below that defendant has failed to meet either standard.

3

■ Defendant identifies four ways in which the inequitable conduct that occurred during the prosecution of the '818 patent is related to the '195 and '202 patents. First, defendant notes that the claims of the patents are similar in subject matter. Def Br (Doc # 1301) at 26–27. Claim 15 of the '195 patent and claims 7 and 14 of the '202 patent describe the use of a thermostable polymerase in PCR. See '195 Patent (Doc # 1313, Exh I) at 41:60–68 (describing "an enzyme that after being exposed to a temperature of about 65 –90 C. forms said extension products"); '202 Patent (Doc # 1313, Exh G) at 27:67–28:7, 28:26–31 (same). The '818 patent describes one such thermostable enzyme. See '818 Patent (Doc # 1313, Exh C) at 44:47–52.

This relation does not suffice to constitute an "immediate and necessary rela-tion" under *Keystone Driller.* Instead, defendant has pointed to a mere similarity in subject matter. See *Consolidated Aluminum,* 910 F.2d at 810–11 (requiring, impliedly, "more than mere relatedness of subject matter" to support a holding of unenforceability as to other patents-in-suit).

Second, defendant points to citations in the text of the '818 patent and its parent application. The '818 patent's parent application, U.S. Application Serial No 899,-241, refers to copending application numbers 828,144 and 791,308, which are the applications from which the '195 and '202 patents issued, respectively. See Application (Doc # 1307, Exh 2). Further, the '818 patent lists both the '195 and '202 patents in the list of United States patent documents cited as references. '818 Patent (Doc # 1313, Exh C).

The mere citation to the '195 and '202 patents does not suffice to demonstrate an "immediate and necessary relation" under *Keystone Driller.* Notably, the '818 patent does not share a common parent application with the '195 and '202 patents. In *Baxter,* the Federal Circuit refused to hold a patent unenforceable even though inequitable conduct occurred during the prosecution of the patent's parent application. *Baxter,* 149 F.3d at 1331–32. Because mere citation is a more distant relationship than sharing a parent application, the court concludes that mere citation does not, by itself, demonstrate an immediate and necessary relation.

Further, with one exception, the inventors originally listed in the '818 patent are different from the inventors listed in the '195 and '202 patents. See '818 Patent (Doc # 1313, Exh C) (listing David Gelfand, Suzanne Stoffel, Frances Lawyer and Randall Saiki); '195 Patent (Doc # 1313, Exh G) (listing Kary Mullis); '202 Patent (Doc # 1313, Exh I) (listing Kary Mullis, Henry Erlich, Norman Araheim,

Glenn Horn and Randall Saiki). Further, Randall Saiki, who was listed on both the '818 patent and the '202 patent, was removed as a named inventor of the '818 patent on or about March 7, 1989. *Roche I,* 1999 WL 1797330 at FF 14.

Third, defendant notes that the timing of the prosecution of the '818 patent overlapped with the timing of the prosecution of the '195 and '202 patents. The '818 patent's parent application was filed before the '195 and '202 patents issued. Further, at least one material misstatement associated with the prosecution of the '818 patent occurred while the '195 and '202 patents were pending.

The court is unpersuaded that a mere overlap in timing between the prosecution of the patents and the inequitable conduct suffices to demonstrate an immediate and necessary relation. Instead, the court concludes that the unconscionable acts that occurred during the prosecution of the '818 patent must be substantively related or material to the prosecution of the '195 and '202 patents to hold unenforceable the '195 and '202 patents. See *Baxter,* 149 F.3d at 1330–32 (refusing to hold unenforceable a patent that was prosecuted at the same time as others held unenforceable for inequitable conduct).

Finally, defendant claims that the patentees took inconsistent positions with the PTO during the prosecution of the '202 and '818 patents.

The court recounts some of the facts supporting the court's finding of inequitable conduct during the prosecution of the '818 patent to provide ready comparison with the prosecution history of the '202 patent. The patentees made relevant statements on at least three occasions. First, the '818 patent's parent application, filed on August 22, 1986, contained representations regarding the fidelity and specific activity of the thermostable enzyme claimed by the '818 patent. The court,

however, did not rely substantially on these early statements in concluding that inequitable conduct occurred. Second, Example VI was first introduced in the 063,509 continuation-in-part, which was filed on June 17, 1987. Third, on March 17, 1989, the patentees responded to an office action rejection. This response contained numerous misstatements that distinguished the thermostable enzyme in the '818 patent from the thermostable enzyme produced by Kaledin and Chien. For example, the patentees made the following representations:

- Kaledin and Chien " 'isolated a crude preparation of degraded Taq polymerase.' "

- Kaledin and Chien " 'experienced *a severe* degradation problem.' "

- The Kaledin and Chien procedures " 'did not yield full-length Taq polymerase.' "

- The polymerases produced by Kaledin and Chien " '*are not suitable* for template-directed *in vitro* DNA synthesis, because the enzymes have a rather substantial promiscuous ability to synthesize DNA on a natural DNA template.' "

*Roche I,* 1999 WL 1797330 at FF ¶¶ 27, 38, 43 (quoting Response to Office Action, March 17, 1989, Promega Tr Exh 640) (emphases in original).

Defendant contends that the above-described statements made during the prosecution of the '818 patent directly contradict statements made during the prosecution of the '202 patent and thus create an immediate and necessary relation. In the prosecution of the '202 patent, the examiner concluded that the application that resulted in the '202 patent did not "disclose heat-stable enzymes for all reactions catalyzed." Office Action, Aug 22, 1986 (Doc # 1313, Exh P) at MC24860, MC24863.

Four arguments in support of patentability were made to overcome the office action rejection. First, the response argued that an applicant "need not provide a specific example of everything embraced by a broad claim." Response, Oct 25, 1986 (Doc # 1313, Exh P) at MC24910, MC24920. Second, and most importantly, the inventors claimed that "the thermostable enzyme derived from *Thermus aquaticus*, as described in the Kaledin et al. article * * * may be employed for all claimed amplification reactions wherein DNA is the template." Id. at MC24920. Third, the response pointed to data resulting from an experiment supervised by Erlich, one of the named inventors on the '202 patent. This experiment involved the "successful use of a heat-stable enzyme isolated and purified from *Thermus aquaticus*." Id. Finally, the response argued that the use of any heat-stable enzyme would be covered by the '202 patent. Id. at MC24921.

The court concludes that defendant has failed, on the present record, to demonstrate an immediate and necessary relation. First, the factual record has not yet been adequately developed. Even if the inquiry is a question of equity, the court requires a sufficient factual showing before it will exercise its equitable discretion. The courts's finding of inequitable conduct as to the '818 patent came after extensive summary judgment briefing and a bench trial. At this point, the court has little information regarding the prosecution of the '195 and '202 patents. In retrospect, it seems unfortunate that the prosecution history of the '195 and '202 patents was not considered simultaneously with the prosecution history of the '818 patent.

Second, the statements made during the prosecution of the '818 patent that most clearly conflict with the statements made during the prosecution of the '202 patent occurred almost two years after the '202 patent issued. Plaintiffs make much of this fact, contending that statements in prosecuting the '818 patent that were made after the close of prosecution of the '195 and '202 patents cannot be relevant in determining whether an immediate and necessary relation exists. Plaintiffs rely primarily on *SSIH Equipment SA v. United States International Trade Commission*, 718 F.2d 365, 378–79 (Fed.Cir. 1983), for their argument. In *SSIH Equipment*, the Federal Circuit refused to hold unenforceable one patent (the "prior patent") based on alleged inequitable conduct that occurred during the prosecution of two other patents-in-suit (the "later patents"). The Federal Circuit found two facts dispositive: (1) the applications that resulted in the later patents were filed three years after the prior patent issued and (2) the later patents did "not deal with the invention claimed" in the prior patent. Id. at 378. Accordingly, the court concludes that timing may be a factor in the court's determination whether an immediate and necessary relation exists, but timing is not, by itself, dispositive.

Third, the response to the office action rejection occurred during the prosecution of the application from which the '202 patent issued. The court questions, therefore, whether the '195 patent should be held unenforceable based on an inconsistency between the prosecution of the '818 and the '202 patents.

Accordingly, the court concludes that defendant has failed, on the present record, to demonstrate an immediate and necessary relation. The court does not conclude at this stage that defendant will not be able to produce sufficient evidence to support a claim of infectious unenforceability or inequitable conduct as to the '195 and '202 patents. Indeed, the court is quite troubled by the apparently contradic-

tory positions taken before the PTO in the prosecution of the '202 and '818 patents.

## B

■■■ Defendant contends, in the alternative, that the court should exercise its discretion under the doctrine of unclean hands to dismiss the claims based on the '195 and '202 patents or the litigation in its entirety. Def Br (Doc # 1301). As with infectious unenforceability, the court is required to determine whether there was an "unconscionable act of one coming for relief [that] has an immediate and necessary relation to the equity that he seeks." *Keystone Driller,* 290 U.S. at 245, 54 S.Ct. 146. Unlike infectious unenforceability, the court may consider conduct occurring both before and after the patent was obtained in determining whether a party has unclean hands. The parties point to two primary cases to guide the court's unclean hands analysis: *Keystone Driller* and *Precision Instrument.*

### 1

#### a

In *Keystone Driller,* the inventor of four of five patents owned by the plaintiff filed his first patent application without disclosing "a possible prior use at Joplin, Mo., by Bernard R. Clutter" about which the inventor had information. 290 U.S. at 243, 54 S.Ct. 146. After obtaining its patents, the plaintiff brought suit against the Byers Machine Company alleging infringement of four of the five patents. The plaintiff was advised by its attorneys that "the prior use at Joplin was sufficient to cast doubt upon the validity of the patent." *Id.* To cover up the prior use, the inventor paid money to Clutter "to keep secret the details of the prior use." *Id.* This misconduct was not detected by the *Byers* court, which found two patents valid and infringed, one patent valid but not infringed and one patent invalid. *Id.* at 242–43, 54 S.Ct. 146.

The plaintiff in *Keystone Driller* attempted to enforce its patents against other alleged infringers in subsequent actions that were consolidated for trial (collectively, *"General Excavator"*). The *General Excavator* defendants became suspicious of Clutter's testimony and eventually "were able to compel the plaintiff to furnish the details of the corrupt transaction." *Id.* at 244, 54 S.Ct. 146. The district court in *General Excavator* censured the plaintiff for its actions but did not dismiss the case because the misconduct did not occur during the pendency of the case before the district court. The district court's decision not to dismiss was reversed on appeal.

The Supreme Court affirmed the appellate court's reversal, defining the unclean hands doctrine in these now-familiar terms: "[Courts of equity] apply the maxim regarding clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* at 245, 54 S.Ct. 146. The Supreme Court identified three relationships in support of a finding of unclean hands. First, the prior proceedings in *Byers* were sufficiently related because the plaintiff used the judgment obtained in the prior case, *Byers,* to require a bond from the defendants in the subsequent case, *General Excavator.* Second, the technology underlying the patents was related. *Id.* at 246, 54 S.Ct. 146 ("[T]he devices covered by the five patents [are] important, if not essential, parts of the same machine."). Third, the claims of the patent were related in that the "claims warrant the inference that each supplements the others." *Id.*

#### b

In *Precision Instrument,* the Supreme Court revisited the unclean hands doctrine in the patent context. 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381. Two inventors,

Herman Zimmerman and Kenneth Larson, filed patent applications based on innovations in torque wrench design. The PTO declared an interference between the Zimmerman and Larson applications. During the interference proceedings, Larson provided an affidavit and oral testimony, falsely claiming that he was the sole inventor and that his invention was completed one to three years before Zimmerman's invention. Larson's false testimony was discovered by Zimmerman and Zimmerman's employer, Automotive Maintenance Machinery Company ("Automotive"), but not by the PTO examiner.

In exchange for not revealing that Larson had falsely testified, Automotive obtained (1) a stipulation that Zimmerman's invention predated Larson's invention, (2) an assignment of Larson's pending patent application to Automotive and (3) various contractual agreements by which the right to manufacture torque wrenches by Larson and Larson's company, Precision Instruments, was limited. Thereafter, Automotive obtained two patents that issued from the Larson and Zimmerman applications. Despite the agreements, Precision Instruments began to manufacture a new torque wrench. Automotive brought an action for patent infringement and breach of contract.

The Supreme Court concluded that the actions taken by Automotive and Zimmerman during the prosecution of the patents were unconscionable. The Supreme Court further concluded that there was a sufficient relationship between the unconscionable acts and the patents that issued from both the Larson and Zimmerman applications. Accordingly, the Supreme Court upheld the district court's dismissal of the lawsuits for " 'want of equity.' " *Id.* at 808, 65 S.Ct. 993.

2

Under the doctrine of unclean hands, the court may consider conduct that oc-curred both during and after the procedures before the PTO. Defendant raises five claims of unconscionable acts and two relations in addition to those discussed above.

First, defendant contends that plaintiffs' licensing strategy imposed unconscionable licensing fees on the licensees. Defendant claims that plaintiffs have licensed its thermostable enzyme at a "charge more than five times higher than free market cost." Def Br (Doc # 1301) at 28. But defendant provides no evidentiary support for this contention and, even if true, this allegation does not demonstrate an unconscionable act under *Keystone Driller* and *Precision Instrument.*

Second, defendant points to misstatements made during the present proceedings by one of the inventors of the '818 patent, David Gelfand, and plaintiffs' experts. Defendant's contention that these statements constitute unconscionable acts is based, in large part, on the court's finding that some witnesses lacked credibility. See, e g, *Roche I*, 1999 WL 1797330 at FF ¶¶ 31, 36 & 37. The concealment of data here somewhat resembles, but was not as elaborately carried out as, the misconduct in *Keystone Driller*. Furthermore, the concealment here appears to have been an intentional omission, not an intentional misstatement as in *Precision Instrument.*

Third, defendant claims that plaintiffs continued to pursue litigation even after defendant raised the inequitable conduct defense. The court finds this argument unpersuasive. It is not "unconscionable" for a plaintiff to continue to litigate a case, even if the defendant raises a defense that is later found to be meritorious.

Fourth, defendant contends that one of plaintiffs' attorneys, Scott Familiant, altered an exhibit before showing it to a deponent. Def Br (Doc # 1301) at 29.

Defendant's argument is spurious. The "alteration" described by defendant was merely Familiant's own enlarged copy of a deposition exhibit on which he had correctly traced over a number that was difficult to read. Familiant Decl (Doc # 1308). A clean copy of the document was given to the deponent during the deposition and Familiant's copy was given to the deponent only after the deponent requested access to an enlarged copy. *Id.*

Fifth, defendant points to various alleged indiscretions committed by plaintiffs related to discovery. The court concludes that none of these indiscretions, even if true, rises to the level of an unconscionable act for purposes of the unclean hands doctrine. Instead, FRCP 37 is a more appropriate means of obtaining relief from such discovery problems.

Defendant also describes two relations between the '818 patent and the '195 and '202 patents occurring after the patents issued. First, plaintiffs pursued a licensing strategy that often involved all three patents. See Def Br (Doc # 1301) at 23. Defendant argues that plaintiffs have used the '818 patent, which was improperly acquired, to bolster its licensing agreements involving the '195 and '202 patents. Such a relation is merely tangential to the litigation presently before the court because the court is not being asked to enforce a license based on all three patents; instead, the license between plaintiffs and defendant covers only the '818 patent. Accordingly, the court concludes that the relation does not suffice to demonstrate an "an immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller,* 290 U.S. at 245, 54 S.Ct. 146.

Second, defendant points out that plaintiffs have brought the '195, '202 and '818 patents in the same lawsuit and have emphasized, at times, the relationship between these three patents. The court is well aware that all three patents have been raised in this litigation and that the patents have a close technological relation. The court concludes, however, that such a relation does not merit dismissal of the remaining claims.

Accordingly, the court remains unconvinced that the '195 and '202 patents were sufficiently related to the unconscionable acts during the prosecution of the '818 patent to warrant dismissal of plaintiff's causes of action for infringement of the '195 and '202 patents, or the case in its entirety. Defendant has provided no unconscionable acts that occurred after the patents-in-suit issued. Although the court recognizes that a somewhat less stringent standard may be permitted in merely dismissing a cause of action rather than holding a patent unenforceable, the court concludes that dismissing the claims based on the '195 and '202 patents, or the case in its entirety, is not merited on the basis of the present record.

V

The court now considers whether to dismiss plaintiffs' first through fourth causes of action (collectively, the "breach of contract claims"). These causes of action are based on a license agreement between plaintiffs and defendant effective July 1, 1990. Second Am Compl (Doc # 455 & Doc. # 1307, Exh 5); License Agreement (Doc # 1307, Exh 22).

██ Defendant first argues that enforcement of the breach of contract claims is against public policy because the patent system operates on the principle "that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 151, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). This background policy principle of patent law does not support defendant's argument

to dismiss the breach of contract claims. Notably, defendant has provided no case law holding that dismissal of breach of contract claims on this policy ground is appropriate on similar facts to the case at bar. See Def Br (Doc # 1301) at 36–37 (citing the following cases); *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (holding that a dual-spring temporary road sign could not receive trade dress protection because its design was functional); *Bonito Boats*, 489 U.S. 141, 109 S.Ct. 971 (holding that a Florida statute prohibiting the use of the direct molding process to copy unpatented boat hulls was preempted by the patent laws); *Blonder–Tongue Laboratories, Inc. v. Univ. of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (holding that the patentee was estopped from asserting a patent in a subsequent proceeding if the patent has been held invalid in a prior suit brought in federal court); *Phillips v. Avis, Inc*, 1996 WL 288782, 1996 U.S. Dist LEXIS 7342 (N.D.Ill.1996) (granting summary judgment against the plaintiff on claims for trade secret, unfair competition and misappropriation and denying summary judgment on a claim for breach of a contract implied in fact).

■ Defendant next contends that the court should dismiss these claims under *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear*, the Supreme Court overturned the doctrine of licensee estoppel, under which licensees had been estopped from challenging the validity of the underlying patent. The court balanced the "competing demands of the common law of contracts and the federal law of patents" and concluded that the federal interest in promoting challenges to patent validity outweighed the licensor's contract interests. *Id.* at 668, 89 S.Ct. 1902. To invoke the *Lear* doctrine, a licensee must cease payments and provide "notice to the licensor that the reason for

ceasing payment of royalties is because it has deemed the relevant claims to be invalid." *Studiengesellschaft ·Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1568 (Fed.Cir. 1997). *Lear* establishes a bright-line rule regarding damages. A licensee remains liable for royalties until the time it first challenged the validity of the claims but is not liable for royalties after such time. *Id.*

■ To dismiss plaintiffs' breach of contract claims under *Lear*, the court would be required to extend *Lear* in two ways. First, *Lear* would need to be extended to include findings of unenforceability. Although *Lear's* holding relates only to invalidity, the *Lear* court discussed unenforceability as a compelling example. *Id.* at 669–70, 89 S.Ct. 1902 (describing a situation in which a patentee commits "fraud on the Patent Office"). The *Lear* court indicated that a patentee whose patent is held unenforceable through inequitable conduct should not be allowed "to invoke the court's assistance on his behalf." *Lear*, 395 U.S. at 669–70, 89 S.Ct. 1902. This language suggests that *Lear* could be extended to include findings of unenforceability.

Second, *Lear* would need to be extended to allow dismissal of the entire contract-related cause of action. *Lear* established a bright-line damages rule allowing some, but not all, of the royalties under the license agreement to be recovered. Defendant contends that dismissal of the entire cause of action is justified because an unenforceable patent is "'void ab initio.'" Def Br (Doc # 1301) at 38 (quoting *Aptix*, 269 F.3d at 1376). The court finds this argument unpersuasive. A finding of invalidity also indicates that a patent should not have issued. Moreover, courts tend narrowly to construe *Lear's* bright-line damages rule. See *Studiengesellschaft Kohle*, 112 F.3d at 1567 (collecting cases distinguishing *Lear*). In *Studiengesells-*

*chaft Kohle,* the Federal Circuit emphasized that *Lear* represents one of the "rare, but potential, conflicts between state contract law and federal patent law." 112 F.3d at 1567. Because a licensee enjoys "significant benefits" under the contract, including being "insulated from investigations of infringement," the Federal Circuit determined that it would be unjust to allow the defendant "to exploit the protection of the contract and patent rights and then later to abandon conveniently its obligations under those same rights." *Id.* at 1568.

■■■ Defendant finally contends that the breach of contract claims should be dismissed under the doctrine of unclean hands. The court first considers whether the bright-line damages rule in *Lear* bars the court from using its equitable discretion to dismiss these claims. As emphasized by the Supreme Court in *Keystone Driller* and *Precision Instrument,* the doctrine of unclean hands is " 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' " *Precision Instrument,* 324 U.S. at 814, 65 S.Ct. 993 (quoting *Keystone Driller,* 290 U.S. at 246, 54 S.Ct. 146). Accordingly, the court concludes that *Lear* does not bar the court from considering whether to exercise its equitable discretion to dismiss the breach of contract claims.

To invoke the doctrine of unclean hands, defendant must demonstrate an "unconscionable act" with an "immediate and necessary relation" to the equity sought by plaintiffs. *Keystone Driller,* 290 U.S. at 245, 54 S.Ct. 146. In holding unenforceable the '818 patent, the court found a number of unconscionable acts. Accordingly, the question before the court is whether there was an immediate and necessary relation between the previously described unconscionable acts and the breach of contract claims.

The court concludes that the inequitable conduct that occurred during the prosecution of the '818 patent bears an immediate and necessary relation to the July 1, 1990, license that underlies the breach of contract claims. The license of the '818 patent is the primary consideration provided by plaintiffs in the license agreement. Indeed, without the '818 patent, there would have been no license agreement. Furthermore, the court concludes, in its equitable discretion, that dismissal of the breach of contract claims is warranted. This conclusion is based on the facts the court has considered in detail throughout this litigation. This conclusion is also based on the concern that a potential licensee normally is not in a position to discover inequitable conduct before agreeing to a license. This case is no exception. It seems unlikely that defendant could have uncovered the inequitable conduct committed during the prosecution of the '818 patent, such as the inventors' failure to perform Example VI as described, before entering into the licensee agreement.

Accordingly, the court GRANTS defendant's request to dismiss the breach of contract claims.

## VI

■■■ Defendant also moves the court to dismiss plaintiffs' ninth and tenth causes of action for tortious interference with contract and prospective economic advantage (collectively, the "tortious interference claims"). These claims are based primarily on a distribution agreement between plaintiffs and Perkin–Elmer dated December 11, 1991. See Distribution Agreement (Doc # 1307, Exh 23). For the same reasons described above, the court concludes that dismissal is not warranted (1) on general policy principles or (2) under the *Lear* doctrine.

The court further concludes that dismissal is not warranted under the doctrine of unclean hands. The court finds the tortious interference claims distinguishable from the breach of contract claims. The relation between the enforceability of the '818 patent and the enforcement of the breach of contract claims is concrete and direct. The relation between the enforceability of the '818 patent and a claim for tortious interference is neither concrete nor direct. To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege elements such as an economic relationship with the probability of future economic benefit. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). Thus, a claim for tortious interference with prospective economic advantage does not require direct reliance on the enforceability of the '818 patent. Although further evidence may demonstrate a more direct relation than is currently apparent, the court DENIES, at this time, defendant's request to dismiss the tortious interference claims.

### VII

Defendant also requests an award of attorney fees and expenses. Because the court has declined to dismiss a significant number of plaintiffs' causes of action, defendant's attorney fee request is premature.

### VIII

In sum, the court GRANTS in part and DENIES in part plaintiffs' request for remedies. Def Br (Doc # 1301). The court HOLDS unenforceable the '818 patent and DISMISSES plaintiffs' eighth cause of action. The court DISMISSES plaintiffs' first through fourth causes of action.

The court DIRECTS the parties to attend a case management conference at 9:00 am on May 25, 2004, or if this date is not convenient, the court DIRECTS the parties to confer to determine an alternative date and contact the deputy clerk to set up a conference at a date convenient to their schedules.

IT IS SO ORDERED.